JUDGE DANIELS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

THE UNION CENTRAL LIFE INSURANCE : Civil Action No.
COMPANY, AMERITAS LIFE INSURANCE :
CORP. and ACACIA LIFE INSURANCE :
COMPANY,

                      Plaintiffs,

     vs.

CREDIT SUISSE SECURITIES (USA), LLC, :
CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP., DLJ :
MORTGAGE CAPITAL, INC., ANDREW A. :
KIMURA, JEFFREY A. ALTABEF, :
EVELYN ECHEVARRIA, MICHAEL A. :
MARRIOTT, THOMAS ZINGALLI and :
BRUCE S. KAISERMAN, :

                    Defendants.

———————————————————— x

**11 CIV 2327**

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND NEW
YORK COMMON LAW FRAUD,
NEGLIGENT MISREPRESENTATION AND
UNJUST ENRICHMENT



DEMAND FOR JURY TRIAL

## NATURE OF THE ACTION

1.      The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company (collectively "Plaintiffs" or "Union Central") bring this action to recover losses suffered due to Plaintiffs' acquisition of asset-backed securities (the "Certificates") pursuant to false and misleading statements made by defendants Credit Suisse First Boston Mortgage Securities Corp. and DLJ Mortgage Capital, Inc. (hereinafter referred to collectively as "CSFB") and other defendants, including in Registration Statements and Prospectus Supplements filed with the United States Securities and Exchange Commission ("SEC") (collectively, the "Registration Statements"). This action involves a fraud perpetrated on Union Central by CSFB and certain of its officers.

2.      The Certificates were supported by pools of residential mortgage loans generally secured by first or second liens on residential properties. The Registration Statements and other statements disseminated to Union Central were false and misleading in that they included false statements and/or omissions about the processes and practices used to select the pools of mortgage loans and the quality of those loans. The statements omitted findings by CSFB's outside consultant that many mortgage loans in the pools did not comport with the stated loan underwriting guidelines. Defendants concealed important information, including that the outside firm CSFB had hired to evaluate the loans had found that more than 40% of CSFB's mortgage loans included in offerings during this time period did not conform to standards which CSFB represented to investors had been used to originate the loans. Defendants actually knew about these deficiencies prior to securitization and failed to require replacement loans for  the majority of the deficiencies and concealed the deficiencies from Union Central and other investors.

3.      CSFB established the trusts identified in ¶35 (the "Trusts") to issue hundreds of millions of dollars worth of Certificates in 2005 through 2007.

4.     In 2010, the truth began to be revealed to the public as to defendants' actual knowledge at the time of the securitizations of defects in the mortgage pools that support the Certificates. In late 2010, the Financial Crisis Inquiry Commission ("FCIC") began disclosing certain of its findings. The FCIC had spent more than a year examining the causes of the financial crisis.

5.     Plaintiffs sold part or all of certain of the Trusts they had acquired at a loss when defects in the mortgage pools became apparent. For the portions of Trusts still held by Plaintiffs, the Certificates are no longer marketable at prices anywhere near the prices paid and it is now clear that the Certificates were exposed to much more risk with respect to both the timing and absolute cash flow to be received than the defendants' statements represented. Plaintiffs were never compensated for the level of risk the Certificates actually posed. Plaintiffs sought investments that were conservative but also generated a reasonable yield. As part of their purchases, Plaintiffs and their advisors relied on term sheets, the Registration Statements and other statements provided to Plaintiffs by defendants which made representations about the mortgages and the underwriting standards, appraisals and ratios, including the loan-to-value ratio. These representations were material to Plaintiffs' investment decision. These representations were also materially false and misleading. Defendants either knowingly or recklessly made these statements.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the action pursuant to 28 U.S.C. §1331. Certain claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), and Rule 10b-5 promulgated thereunder [17 C.F.R. §§240.10b-5]. Jurisdiction is conferred by §27 of the 1934 Act and venue is proper pursuant to §27 of the 1934 Act.

7.     This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a)(1), in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000,

exclusive of interest and costs. Plaintiffs The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company are citizens of Nebraska and Washington, D.C. and defendants are citizens of the States of New York and North Carolina.

8.     Venue is proper in this District because the violations of law complained of herein occurred in part in this District, including the dissemination of the materially false and misleading statements complained of herein. Defendants conduct business in this District. The depositor of the mortgage loans for many of the Trusts had principal offices in New York, New York.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiffs The Union Central Life Insurance Company, Ameritas Life Insurance Corp. and Acacia Life Insurance Company acquired Certificates in reliance on defendants' false statements, including those in the Registration Statements and Prospectus Supplements, and have been damaged thereby. Plaintiffs purchased CSFB Certificates as described in Exhibit 1 attached hereto.

11.     Defendant Credit Suisse Securities (USA) LLC ("CSFB Underwriter") provides financial services, including mortgage banking. It is a Delaware corporation based in New York, New York. CSFB Underwriter acted as the underwriter in the sale of CSFB's offerings, helping to draft and disseminate the offering documents.

12.     Defendant Credit Suisse First Boston Securities Corp. is a Delaware corporation with principal executive offices in New York, New York and was the depositor for the Trusts. Credit Suisse First Boston Mortgage Securities Corp. assigned mortgage pools to the Trusts in exchange for the Certificates. The Certificates were transferred to CSFB Underwriter for sale to the investing

public. Credit Suisse First Boston Securities Corp. was an issuer of all of the Certificates and the registrant of all of the Registration Statements. Defendant DLJ Mortgage Capital, Inc., a Delaware corporation with principal offices in New York, New York, and an affiliate of the depositor, was the seller of the Trusts. Defendants Credit Suisse First Boston Mortgage Securities Corp. and DLJ Mortgage Capital, Inc. are collectively referred to herein as "CSFB."

13.    Defendant Andrew A. Kimura ("Kimura") was a director and President of CSFB during the relevant time period. Through his attorney, defendant Kimura signed a Form S-3 comprising part of the Registration Statements pursuant to the offering of the Series 2007-1 and Series 2007-3 Certificates, on or about June 29, 2006, both individually and on behalf of CSFB.

14.    Defendant Jeffrey A. Altabef ("Altabef") was a director and Vice President of CSFB during the relevant time period. Through his attorney, defendant Altabef signed a Form S-3 comprising part of the Registration Statements pursuant to the offering of the Series 2007-1 and Series 2007-3 Certificates, on or about June 29, 2006.

15.    Defendant Evelyn Echevarria ("Echevarria") was a director of CSFB during the relevant time period. Through her attorney, defendant Echevarria signed a Form S-3 comprising part of the Registration Statements  pursuant to the offering of the Series 2007-1 and Series 2007-3 Certificates, on or about June 29, 2006.

16.    Defendant Michael A. Marriott ("Marriott") was a director of CSFB during the relevant time period. Through his attorney, defendant Marriott signed a Form S-3 comprising part of the Registration Statements pursuant to the offering of the Series 2007-1 and Series 2007-3 Certificates, on or about June 29, 2006.

17.    Defendant Thomas Zingalli ("Zingalli") was Principal Accounting Officer and Comptroller of CSFB during the relevant time period. Through his attorney, defendant Zingalli

signed a Form S-3 comprising part of the Registration Statements pursuant to the offering of the Series 2007-1 and Series 2007-3 Certificates, on or about June 29, 2006.

18.     Defendant Bruce S. Kaiserman ("Kaiserman") was Vice President of CSFB. Kaiserman signed the Form 10-Ks for the Trusts.

19.     The defendants identified in ¶¶13-18 are referred to herein as the "Individual Defendants."

20.     These defendants aided and abetted, and/or participated with and/or conspired with the other defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences and events alleged in this Complaint.

## BACKGROUND

**Residential Mortgage Loan Securitizations**

21.     Borrowers who require funds to finance the purchase of a house or to refinance an existing mortgage apply for residential mortgage loans with a loan originator.  These loan originators assess a borrower's ability to make payments on the mortgage loan based on, among other things, the borrower's Fair Isaac & Company ("FICO") credit score.  Borrowers with higher FICO scores were able to receive loans with less documentation during the approval process, as well as higher loan-to-value ("LTV") ratios.  Using a person's FICO score, a loan originator assesses a borrower's risk profile to determine the rate of the loan to issue, the amount of the loan, and the general structure of the loan.

22.     A loan originator will issue a "prime" mortgage loan to a borrower who has a high credit score and who can supply the required documentation evidencing their income, assets, employment background, and other documentation that supports their financial health.  Borrowers

who are issued "prime" mortgage loans are deemed to be the most creditworthy and receive the best rates and structure on mortgage loans.

23. If a borrower has the required credit score for a "prime" mortgage loan, but is unable to supply supporting documentation of his financial health, then a loan originator will issue the borrower a loan referred to as a "low-doc" or Alt-A loan, and the interest rate on that loan will be higher than that of a prime mortgage loan and the general structure of the loan will not be as favorable as it would be for a prime borrower. While borrowers in "low-doc" or Alt-A loans typically have clean credit histories, the risk profile of the "low-doc" or Alt-A loan increases because of, among other things, higher LTV ratios, higher debt-to-income ratios or inadequate documentation of the borrower's income and assets/reserves.

24. A borrower will be classified as "sub-prime" if the borrower has a lower credit score and higher debt-to-equity ratios. Borrowers that have low credit ratings are unable to obtain a conventional mortgage because they are considered to have a larger than average risk of defaulting on a loan. For this reason, lending institutions often charge interest on sub-prime mortgages at a rate that is higher than a conventional mortgage in order to compensate themselves for assuming more risk.

**The Secondary Market**

25. Traditionally, the model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan. The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this simple model, the loan originator held the promissory note until it matured and was exposed to the concomitant risk that the borrower may fail to repay the loan. As such, under the traditional model, the loan originator had a financial incentive to ensure that (1) the borrower had the financial

wherewithal and ability to repay the promissory note, and (2) the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

26.     Beginning in the 1990s, persistent low interest rates and low inflation led to a demand for mortgages.  As a result, banks and other mortgage lending institutions took advantage of this opportunity, introducing financial innovations in the form of asset securitization to finance an expanding mortgage market.  As discussed below, these innovations altered (1) the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and (2) the risks normally associated with mortgage loans.

27.     Unlike the traditional lending model, an asset securitization involves the sale and securitization of mortgages.  Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution.  By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.  The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as mortgage-backed securities or MBS.  In addition to receiving proceeds from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the MBS.

28.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS, whereby the investors acquire rights in the income flowing from the mortgage pools:

- 7 -



(Source: *The Wall Street Journal*)

29.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors. The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.

30.     In this MBS structure, the senior tranches received the highest investment rating by the rating agencies, usually AAA. After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. In accordance with their order of priority, the mezzanine tranches were generally rated from AA to BBB by the rating agencies.

31.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches. This process is repeated each month and all investors receive the payments owed to them so long as the borrowers are current on their mortgages. The following diagram illustrates the concept of tranches within an MBS comprised of residential mortgages (often referred to as a "residential mortgage backed securities" or "RMBS"):



(Source: *The Wall Street Journal*)

32.     As illustrated below, in the typical securitization transaction, participants in the transaction are (1) the servicer of the loans to be securitized, often called the "sponsor," (2) the depositor of the loans in a trust or entity for securitization, (3) the underwriter of the MBS, (4) the entity or trust responsible for issuing the MBS, often called the "trust," and (5) the investors in the MBS.

33.     The securitization process begins with the sale of mortgage loans by the sponsor – the original owner of the mortgages – to the depositor in return for cash.  The depositor then sells those mortgage loans and related assets to the trust, in exchange for the trust issuing certificates to the depositor.  The depositor then works with the underwriter of the trust to price and sell the certificates to investors:



34.     Thereafter, the mortgage loans held by the trusts are serviced, *i.e.*, principal and interest are collected from mortgagors, by the servicer, which earns monthly servicing fees for collecting such principal and interest from mortgagors. After subtracting a servicing fee, the servicer sends the remainder of the mortgage payments to a trustee for administration and distribution to the trust, and ultimately, to the purchasers of the MBS certificates.

## SUBSTANTIVE ALLEGATIONS

### CSFB's Securitizations

35.     CSFB acquired mortgage loan pools either from affiliated originators or unrelated third parties and transferred the mortgage pools to the Trusts in exchange for the Certificates. The Certificates purchased by Union Central were issued by New York trusts. Each of the Trusts issued hundreds of million of dollars worth of Certificates pursuant to the Registration Statements. The Trusts are:

CSFB MORTGAGE-BACKED TRUST
SERIES 2005-1 ("Series 2005-1")
CSFB MORTGAGE-BACKED TRUST
SERIES 2005-6 ("Series 2005-6")
CSFB MORTGAGE-BACKED TRUST
SERIES 2005-7 ("Series 2005-7")
CSFB MORTGAGE-BACKED TRUST
SERIES 2005-10 ("Series 2005-10")

CSMC MORTGAGE-BACKED TRUST
2006-8 ("Series 2006-8")
CSMC MORTGAGE-BACKED TRUST
2007-1 ("Series 2007-1")
CSMC MORTGAGE-BACKED TRUST
2007-3 ("Series 2007-3")

36.     CSFB Underwriter acquired the Certificates from CSFB and sold them to the investing public pursuant to the Registration Statements.

37.     The Certificates were sold pursuant to Prospectus Supplements that were issued pursuant to three Form S-3 Registration Statements, which were created as "shelf" registrations under Rule 415 of the Securities Act of 1933 ("1933 Act"). These shelf registration statements allowed defendants to rapidly access the capital markets with offerings of MBS to investors, including Plaintiffs.   The Registration Statements relevant to Plaintiffs' purchases were the following:

(a)     Registration Statement No. 333-120966, initially issued December 3, 2004 and August 26, 2005, with amendments dated January 5, 2005 and December 7, 2005, pursuant to Trust Series 2005-1, 2005-6, 2005-7 and 2005-10;

(b)     Registration Statement No. 333-37616, initially issued in 2000, with amendments dated from 2000 through 2010, pursuant to Trust Series 2006-8.

(c)     Registration Statement No. 333-135481, initially issued June 30, 2006 and February 28, 2007, with amendments dated in 2006 and 2007, pursuant to Trust Series 2007-1 and 2007-3.

38.     CSFB filed various documents with the SEC, including Form 8-K and Form 10-K reports subsequent to the issuances. Those documents were incorporated by reference into and along with the Prospectus Supplements which comprise the Registration Statements.

39.     The Registration Statements that were filed with the SEC purport to describe the assets supporting the Certificates. Accurate information about the composition of the asset pool – including, importantly, the manner in which it was created – is the cornerstone of the disclosure required under the 1933 Act to enable investors to make informed decisions about the Certificates.

- 11 -

Complete and accurate information is even more important in the context of selling "asset-backed securities" such as the Certificates, because the performance of the Certificates is based almost entirely upon the quality of the assets CSFB sold to the Trusts.

**Clayton Holdings**

40.     Clayton Holdings ("Clayton"), a Connecticut-based firm that analyzes home mortgages for banks, hedge funds, insurance companies and government agencies, played an important role in the securitization process in that CSFB hired Clayton to analyze a subsection of the home mortgage loans to be securitized. Clayton performed this role and did find defects. However, Clayton's findings were largely ignored.

41.     In late September 2010, Clayton  provided its data to the FCIC, a bipartisan panel created by Congress to investigate the roots of the worst financial crisis since the Great Depression. The FCIC held its last public hearing in Sacramento, the home of the panel's chairman, where two current and former top Clayton executives testified under oath about the firm's role in the mortgage securitization chain.

42.     For CSFB, Clayton found that 37% of the 56,300 loans it reviewed failed to conform to standards. CSFB disregarded these findings and still included a third of those loans found to have defects in the securitizations.

43.     For Citigroup, from whom CSFB acquired many mortgage loans at issue herein, Clayton also performed reviews. Clayton discovered that 42% of Citigroup's pool of loans did not meet standards, and, similar to CSFB, Citigroup disregarded those findings for nearly a third of those loans. Thus, even though CSFB and its officers had actual knowledge that a large percentage of the MBS portfolio reviewed by Clayton failed to conform, they included many of these same loans in securitizations. Moreover, Clayton reviewed only a sample of the loans, leading defendants invariably to the conclusion that there were thousands of additional defective loans which Clayton

had not reviewed.  Defendants concealed the information provided by Clayton about non-compliance and sold the MBS to investors, including Union Central, who were unaware of the failure of many of the loans to conform to standards.  In fact, the only use defendants appeared to have had for Clayton's findings was to use the results as a negotiating point to reduce defendants' costs of the loans.  Nothing was disclosed to the ultimate MBS certificate investors about Clayton's findings.

44.      Certain of the Prospectus Supplements identified Clayton as providing services to CSFB, but concealed the exceptions Clayton identified and the fact that CSFB disregarded the findings.

**Originators**

45.      The originators of the Trusts were GreenPoint Mortgage Funding, Inc. ("GreenPoint"), Fifth Third Bank ("Fifth Third"), DLJ Capital Mortgage, Inc., Countrywide Home Loans Servicing LP ("Countrywide") and Citigroup's CitiMortgage, Inc. ("CitiMortage").  Below are examples of the misstatements with respect to the originators.

46.      The Prospectus Supplements included false statements about the loan underwriting practices of GreenPoint, which was a key originator for the following Trusts:

Series 2005-6
Series 2005-7
Series 2005-10

47.      For example, the Prospectus Supplement for Series 2005-6, dated June 28, 2005, stated:

(a)      The underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, ***certain exceptions to the underwriting standards***

- 13 -

*described herein are made in the event that compensating factors are demonstrated by a prospective borrower.* Neither the depositor nor any affiliate, including DLJ Mortgage Capital, has re-underwritten any mortgage loan. GreenPoint has re-underwritten a portion of the mortgage loans that were purchased by it, rather than originated by it.

***Omitted Information***: Exceptions to guidelines were granted in many circumstances – not just where compensating factors existed. The exceptions were granted when the borrower could not qualify. Many of the loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any degree of realistic control. Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.

(b)     To the extent specified in the related prospectus supplement, the depositor may purchase mortgage loans for inclusion in a trust fund that are underwritten under standards and procedures which vary from and are less stringent than those described in this prospectus. For instance, mortgage loans may be underwritten under a 'limited documentation' program if stated in the related prospectus supplement. With respect to these mortgage loans, minimal investigation into the borrowers' credit history and income profile is undertaken by the originator and such mortgage loans may be underwritten ***primarily on the basis of an appraisal of the mortgaged property*** or Cooperative Dwelling and the loan-to-value ratio at origination. Thus, if the loan-to-value ratio is less than a percentage specified in the related prospectus supplement, the originator may forego certain aspects of the review relating to monthly income, and traditional ratios of monthly or total expenses to gross income may not be considered.

***Omitted Information***: These deficiencies in income documentation made accurate and reliable appraisals essential since so much emphasis was placed on the value of the mortgaged property. However, appraisers were in fact pressured to appraise to certain levels. Appraisers knew if they appraised under certain levels they would not be hired again.

(c)     All of the mortgage loans as of the cut-off date had LTV ratios at origination of 100% or less. Except for 27 mortgage loans representing approximately 0.60% of the Cut-off Date Principal Balance, each mortgage loan with LTV ratio at origination greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac, or any nationally recognized statistical rating organization. The primary mortgage guaranty insurance policy referred to in the

preceding sentence will not be required for any of those mortgage loans after the date on which the related LTV ratio is 80% or less or, based on a new appraised value or as otherwise provided by law.

**Omitted Information**: The documents failed to describe GreenPoint's practice of allowing its staff or outside brokers to demand inflated appraisal values by appraisers which distorted the LTV ratios referred to in the Prospectus Supplement.

> (d)     Single and Multi-Family Mortgage Loans. The mortgage credit approval process for one- to four-family residential loans follows a standard procedure that generally complies with FHLMC and FNMA regulations and guidelines, except that certain mortgage loans may have higher loan amount and qualifying ratios, and applicable federal and state laws and regulations. The credit approval process for Cooperative Loans follows a procedure that generally complies with applicable FNMA regulations and guidelines, except for the loan amounts and qualifying ratios, and applicable federal and state laws and regulations. The originator of a mortgage loan generally will review a detailed credit application by the prospective mortgagor designed to provide pertinent credit information, including a current balance sheet describing assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report that summarizes the prospective mortgagor's credit history with local merchants and lenders and any record of bankruptcy. In addition, an employment verification is obtained from the prospective mortgagor's employer wherein the employer reports the length of employment with that organization, the current salary, and gives an indication as to whether it is expected that the prospective mortgagor will continue such employment in the future. If the prospective mortgagor is self-employed, he or she is required to submit copies of signed tax returns. The prospective mortgagor may also be required to authorize verification of deposits at financial institutions. In certain circumstances, other credit considerations may cause the originator or depositor not to require some of the above documents, statements or proofs in connection with the origination or purchase of certain mortgage loans.

**Omitted Information**: GreenPoint did not verify the income of borrowers as represented but had a reputation in the industry for cutting corners on underwriting. As a result of GreenPoint's poor underwriting practices, GreenPoint's parent, Capital One, took an $860 million charge to the value of GreenPoint.

48.     The Prospectus Supplements made false statements about the underwriting practices of Countrywide and DLJ Capital Mortgage, Inc., which were two of the key originators in the following Trusts:

Series 2006-8
Series 2007-1
Series 2007-3

49.     For example, the Prospectus Supplement for Series 2007-1, dated January 30, 2007,

stated:

(a)     Generally, each mortgagor will have been required to complete an application designed to provide to the original lender pertinent credit information concerning the mortgagor. As part of the description of the mortgagor's financial condition, the mortgagor will have furnished information with respect to its assets, liabilities, income (except as described below), credit history, employment history and personal information, and furnished an authorization to apply for a credit report which summarizes the mortgagor's credit history with local merchants and lenders and any record of bankruptcy. The mortgagor may also have been required to authorize verifications of deposits at financial institutions where the mortgagor had demand or savings accounts. In the case of investment properties and two- to four-unit dwellings, income derived from the mortgaged property may have been considered for underwriting purposes, in addition to the income of the mortgagor from other sources. With respect to mortgaged property consisting of vacation or second homes, no income derived from the property generally will have been considered for underwriting purposes. In the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan application.

***Omitted Information***:  The documents failed to describe the wide latitude lending officers gave to

borrowers to "explain" adverse information.  Lending officers and originators also knew that

borrowers frequently complained to credit rating agencies about adverse information that was in fact

true, knowing that the rating agencies, if they could not confirm the adverse information within a

specified time period, would remove the adverse information from the report.

(b)     The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator. All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the originator or independent appraisers selected in accordance with pre-established appraisal procedure guidelines established by the originator. The appraisal procedure guidelines generally will have required the appraiser or an agent on its behalf to personally inspect the property and to verify whether the property was in good

- 16 -

condition and that construction, if new, had been substantially completed. The appraisal generally will have been based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, an analysis based on income generated from the property or a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Under some reduced documentation programs, the originator may rely on the original appraised value of the mortgaged property in connection with a refinance by an existing mortgagor.

**Omitted Information**: CSFB and DLJ Capital Mortgage, Inc. had weak or no controls to confirm that appraisers were following the guidelines described, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting LTV ratios and making the mortgage loans in the pool much riskier than suggested by the Prospectus Supplements/Registration Statements. This was particularly true in 2006 and 2007, when real estate values in many of the locations where the mortgage pools were located had stopped increasing at the rapid pace of 2004 and 2005. Thus, the aggressive lending practices introduced during those years (where borrowers were granted large mortgages in excess of their ability to pay with the assurance that refinancing would be possible in a short time) were extremely risky and likely to lead to significant defaults in years when real estate prices did not increase or even decreased. DLJ Capital Mortgage, Inc. also granted a high percentage of exceptions to its lending standards to get loans closed.

50.     Additionally, the Prospectus Supplement for Series 2007-3, dated March 30, 2007, stated:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to income" ratios) are within acceptable limits. The maximum acceptable debt-to-income ratio, which is determined on a loan-by-loan basis varies depending on a number of underwriting criteria, including the Loan-to-

Value Ratio, loan purpose, loan amount and credit history of the borrower. In addition to meeting the debt-to-income ratio guidelines, each prospective borrower is required to have sufficient cash resources to pay the down payment and closing costs.

Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower.

***Omitted Information***:   CSFB's and Countrywide's debt-to-income ratios were misstated (understated) by the manipulation of reported income levels on loan applications, many times with the knowledge of the mortgage broker. The broker would get paid if the loan went through – even with false information – but would not get paid if they raised questions. Countrywide and the other originators did not adequately prevent these practices as their motivation was also to get the loans closed – even if there were problems.

## THE FALSE AND MISLEADING REGISTRATION STATEMENTS

51.   CSFB caused Registration Statements to be issued for each of the Trusts and then issued Prospectus Supplements for each Trust between January 2005 and March 2008. These documents were used to register, issue and sell billions of dollars in Certificates.

**Defendants' Failure to Inform Investors that Crucial Representations and Warranties Were Not Adequately Reviewed for Accuracy – if Reviewed at All – Is a Material Omission**

52.   The Registration Statements make the following representation concerning the quality-control processes applied to the collateral supporting the Certificates:

**Removal, Substitution and Repurchase of a Mortgage Loan**

The trustee will acknowledge the sale, transfer and assignment of the trust fund to it by the depositor and receipt of, subject to further review and the exceptions, the mortgage loans. ***If the trustee finds that any mortgage loan is defective on its face to a breach of the representations and warranties with respect to that loan made in the transaction agreements, the trustee shall promptly notify the sponsor of such defect***.

*See, e.g.*, Form S-3/A dated August 10, 2006. The Registration Statements represent that any defective loans would be cured.

- 18 -

53. Further with respect to quality control, the Prospectus Supplements include the statements set forth below:

- "[CSFB] will deliver or cause to be delivered to the trustee, *or a custodian for the trustee, a mortgage file for each mortgage loan which will consist of, among other things,* the original promissory note, or mortgage note, and any modification or amendment." *See, e.g.,* Prospectus Supplement for Series 2007-3, dated March 30, 2007, at S-116.

- *"[I]f any document in a mortgage file is found to be missing* or defective in a material respect and the seller does not cure such defect within 90 days of notice thereof from the trustee or its custodian or within such longer period not to exceed 720 days after such date in the case of missing documents not returned from the public recording office, the *seller will be obligated to repurchase the related mortgage loan from the trust." Id.* at S-117.

- "Rather than repurchase the mortgage loan as provided above, *the seller may remove such mortgage loan (a deleted mortgage loan) from the trust and substitute in its place another mortgage loan (a replacement mortgage loan). However, such substitution is permitted only within two years of the closing date . . . ." Id.*

54. In fact, CSFB had not properly removed defective mortgage loans from the pools as represented in the Prospectus Supplements. Even where Clayton had pointed out defective loans to CSFB (and Citigroup), many of the defects in the mortgage loans were waived. The Registration Statements made additional representations and warranties concerning the mortgage loans, including "each contract at the time it was made complied in all material respects with applicable state and federal laws, including usury, equal credit opportunity and disclosure laws." *See, e.g.,* Prospectus Supplement for Series 2007-1, dated January 30, 2007.

55. As with documentation defects set forth above, if there was any breach of these representations and warranties, the Trusts had the right to force the seller of the mortgages to cure the breach, or replace or repurchase the affected mortgages.

56. The Registration Statements did not disclose the fact that it was virtually impossible for the trustees to ascertain whether any of the mortgage loans were "defective" or were otherwise in

breach of the representations and warranties made to investors and to the trustees. It was not possible because ***crucial documentation*** was withheld from or not reviewed by the trustees.

57.     For example, the trustees did not review mortgage loan applications. An internal manual obtained from one of the largest residential mortgage loan originators in the United States highlights the reasons why this omission is material. The manual states:

> The application is the primary source of information to evaluate applicant profile, asset and liability structure to support claimed income, applicant's management of financial capacity; therefore, ***obtaining a complete application is critical. Inconsistencies in applicant profile or claimed income that is not supported by type of work, training, education and asset liability structure may require additional documentation/verification.***

58.     Nor did the trustees review appraisal reports generated in connection with each loan. One standard form is the Uniform Residential Appraisal Report (Freddie Mac Form 70 March 2005 or Fannie Mae Form 1004 March 2005). This form includes a "certification" that each appraiser must sign. It includes the admonition that "[a]ny intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, §1001, et seq., or similar state laws." This Freddie Mac March 2005 form includes the following representations as well.

(a)     That each appraisal was conducted in accordance with the statement of work, which states: "The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report."

(b)    That none of the appraiser's "employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, *that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application)*."

(c)    That, among others, the "borrower" and "secondary market participants may rely on this appraisal report as part of any mortgage finance transaction."

59.    The foregoing provisions demonstrate that independent, accurate appraisals are important to "secondary market participants," such as Plaintiffs in this case.

60.    Fannie Mae also issued "Frequently Asked Questions – Fannie Mae's Revised Appraisal and Property Report Forms" in November 2005 to explain the foregoing provisions as an effort to "overcome the prevailing feeling in the appraisal and lending communities that appraisers are too often not held accountable for the quality of their appraisals."

61.    As to the certification that "secondary market participants may rely on this appraisal report as part of any mortgage finance transaction," Fannie Mae explained:

> Some appraisers believe that these new certifications have increased their professional accountability and liability. For instance, in new certification #23 [quoted above], the appraiser acknowledges that parties, other than the Lender/Client, often rely on the appraisal report as part of a mortgage finance transaction. *This is simply an acknowledgement by the appraiser of the reality of a mortgage finance transaction. It clarifies that the parties to a mortgage finance transaction, such as . . . secondary market participants, often rely on the appraisal report.* In addition, new certification #25 [also quoted above] was developed for the appraiser to acknowledge that any intentional or negligent misrepresentation may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both.

62.     In short, it was impossible for the one entity that was supposed to review the mortgage files *on behalf of investors* to determine whether they were "defective" because they did not review the most important loan documentation.  Such documents are the most important not only because mortgage originators and federal regulators say so, but because they are clearly the documents most likely to evidence problems with "claimed income" and other indicia of fraud.  The false assurances concerning the enforceability and quality of those loans affected the risk attending the Certificates.  Simply stated, loans backed by mortgages that have been reviewed for legal enforceability and compliance by an entity owing contractual and fiduciary duties *to the investors* are more valuable than loans that have not been reviewed in this manner.

63.     The omitted information is material.  The massive downgrades that credit rating agencies placed on the Certificates in 2008 would not have occurred if the representations and warranties and due diligence practices represented in the Registration Statements had actually occurred.  Among other things, this allegation is supported by statements from the rating agencies that rated the Certificates.

64.     For example, statements by Michael Kanef, the head of the Asset Backed Finance Rating Group at Moody's – a company that rated all of the Certificates – underscore the importance of the accuracy of representations made in the Registration Statements.  Mr. Kanef stated before the U.S. Senate on September 26, 2007 that Moody's reviews the "representations and warranties to the trust for the benefit of investors in every transaction," which "typically stipulate that, prior to the closing date, all requirements of federal, state or local laws regarding the origination of the loans have been satisfied, including those requirements relating to: usury, truth in lending, real estate settlement procedures, predatory and abusive lending, consumer credit protection, equal credit opportunity, and fair housing or disclosure."

- 22 -

65.     With respect to the foregoing representation, which is ***nearly identical*** to those made in the Registration Statements, Mr. Kanef stated on behalf of Moody's that "Moody's has historically relied on these representations and warranties and ***we would not rate a security*** unless the originator or the investment bank had made representations and warranties such as those discussed above."

66.     Since the Registration Statements specifically state that it was a "condition" of the issuance of the offered Certificates that they receive specific ratings from one of the rating agencies, none of the Certificates would have even been issued but for defendants' misrepresentations and omissions. Clearly, the misrepresentations and omissions were material.

67.     It has since become apparent that the material representations and warranties discussed above were actually breached and that crucial information was withheld not only from investors and the trustees but also from the rating agencies.

68.     For example, in an internal Moody's document released to the public on October 22, 2008, the then-President of Moody's, Brian Clarkson, made the following transcribed remarks to a group of senior executives on September 10, 2007:

> At the end of the day, ***we relied on reps and warrantees that no loans were originated in violation of any state or federal law. We know that's a lie. If none were originated in violation of any predatory lending law, we know that's a lie. So what are you going to do about it? We can't rely on what people tell us anymore***, and so we've got to figure out, do we rely on third party oversight? We have to have post-closing audits.

69.     Mr. Clarkson further told *The Wall Street Journal* in 2008, "I hate going through this because it sounds defensive, ***but the fact is that there were people who were supposed to be doing due diligence on this who just didn't do it***."

70.     Contrary to the representations in the Registration Statements, the trustees clearly did not conduct adequate due diligence because CSFB and CSFB Underwriter neglected to provide the

appropriate documentation to them. Defendants also failed to pass along Clayton's findings to the agencies.

## Defendants' Material Misstatements and Omissions Concerning Conflicts of Interest with the Rating Agencies

71.     With respect to many of the Certificates, defendants represented in the January 2005 Form S-3/A Registration Statement: "The expenses expected to be incurred in connection with the issuance and distribution of the Securities being registered, other than underwriting compensation . . . [include estimated] Rating Agency Fees [of] [$]240,000."

72.     The $240,000 figure is materially inaccurate. Defendants failed to explain or correct this figure in any of the subsequent Registration Statements. On information and belief, defendants expected to pay the rating agencies at least approximately $20 million and did pay them at least approximately $17.4 million.

73.     While the Registration Statements informed investors that it was a condition to the issuance of the offered Certificates that they receive an investment grade rating from the rating agencies, defendants failed to explain that the agencies would be compensated *only if* they provided the desired rating. Investors placed their trust in the credit ratings largely *because* they were provided by independent agencies. Recently, acute conflicts of interest have been revealed that undermined the credibility of the ratings at the time they were issued.

74.     For example, as reported on April 11, 2008 in *The Wall Street Journal,* a former Moody's analyst stated that while there was no explicit directive to subordinate ratings objectivity to earn business from investment banks such as CSFB Underwriters, there was "'a palpable erosion of institutional support for rating analysis that threatened market share.'" It was reported in the same article that "Moody's agreed to switch analysts on deals after bankers complained" and that "[a]mong banks that requested that a different analyst look at their deals were *Credit Suisse Group*."

- 24 -

75.     Defendants were negligent or at least strictly liable for failing to disclose to investors the highly risky practices and processes they used to create the Certificates, including pressuring the rating agencies, creating material conflicts of interest and withholding information from them.

76.     On March 30, 2006, Series 2005-1 filed its Form 10-K with the SEC for the fiscal year ended December 31, 2005, with included the following statements:

I, Bruce Kaiserman, certify that:

1.      I have reviewed this annual report on Form 10-K, and all reports on Form 8-K containing distribution and servicing reports filed in respect of periods included in the year covered by this annual report, of CSFB Mortgage-Backed Trust Series 2005-1 (the "Trust");

                        *       *       *

4.      Based on my knowledge and upon the annual compliance statements included in the report and required to be delivered to the Trust Administrator in accordance with the terms of the Pooling and Servicing Agreement and based upon the review required under the Pooling and Servicing Agreement, and except as disclosed in the report, each Servicer and the Master Servicer has fulfilled its obligations under the Pooling and Servicing Agreement; and

5.      The reports disclose all significant deficiencies relating to each Servicer's and the Master Servicer's compliance with the minimum servicing standards based, in each case, upon the report provided by an independent public accountant, after conducting a review in compliance with the Uniform Single Attestation Program for Mortgage Bankers or similar standard as set forth in the Pooling and Servicing Agreement, that is included in these reports.

77.     Almost identical representations by Kaiserman were included in other Form 10-Ks, including for the Series 2005-6, filed on March 30, 2006, for the fiscal year ended December 31, 2005; Series 2005-7, filed on March 30, 2006, for the fiscal year ended December 31, 2005; Series 2005-10, filed on March 30, 2006, for the fiscal year ended December 31, 2005; Series 2006-8, filed on March 29, 2007, for the fiscal year ended December 31, 2006; Series 2006-8, filed on March 27, 2008, for the fiscal year ended December 31, 2007; Series 2007-1, filed on March 28, 2008, for the fiscal year ended December 31, 2007; and Series 2007-3, filed on March 28, 2008, for the fiscal year ended December 31, 2007.

- 25 -

78.     In fact, material instances of non-compliance were concealed from investors with respect to thousands of mortgages.

## DISCLOSURES EMERGE ABOUT THE PROBLEMS
## UNDERLYING THE LOANS

79.     Years and months after Union Central had made its purchases of the Certificates, the credit rating agencies began to lower ratings on certain of the Certificates.  Many of the Certificates were downgraded by the credit rating agencies from "investment grade" to "junk" status.

80.     The ratings action represents only a partial picture of the rapid deterioration of the Certificates issued pursuant to the Registration Statements, as other performance measures of the Certificates show substantial decay.  Some of Union Central's Certificates defaulted.

81.     Note the following developments with respect to the tranches purchased by Union Central:

- Series 2007-1 CB1 – defaulted
- Series 2007-3 4A11 – currently trades at 30% of par
- Series 2007-3 CB1 – currently trades at 4% of par
- Series 2005-1 M4 – currently trades at 13% of par
- Series 2005-1 M5 – currently trades at 10% of par
- Series 2005-1 M6 – currently trades at 5% of par
- Series 2005-1 CB3 – currently trades at 5% of par
- Series 2005-7 CB1 – currently trades at 82% of par
- Series 2005-7 CB2 – currently trades at 78% of par
- Series 2005-6 CB1 – currently trades at 68% of par
- Series 2005-10 CB1 – currently trades at 35% of par
- Series 2006-8 CB1 – defaulted
- Series 2006-8 CB2 – defaulted
- Series 2006-8 CB3 – defaulted

82. Many of Union Central's investments in CSFB MBS defaulted and others dropped precipitously in value as the underlying mortgage loans failed at alarming rates. Later, Union Central learned of CSFB's intentional conduct which caused these failures.

83. However, even as problems in the mortgage loan portfolio became apparent, investors were not aware of defendants' intentional conduct until the findings of Clayton holdings were revealed as part of the FCIC investigation in 2010 and 2011.

84. Defendants' disregard of Clayton's findings and their own failure to investigate properly the assets they were richly compensated to underwrite and sell clearly had a materially negative effect on the Certificates.

## COUNT I

### For Common Law Fraud Against All Defendants

85. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

86. This is a claim for common law fraud against all defendants.

87. CSFB and CSFB Underwriter made materially inaccurate written representations and omissions in substantially identical written materials distributed to Plaintiffs.

88. The false and misleading statements are identified above.

89. The Individual Defendants are liable for the false statements made in connection with the offerings for which they served as directors or officers.

90. CSFB and CSFB Underwriter and the other defendants made the false and misleading statements about the quality of the collateral underlying the MBS.

91. Such statements and the reasons why they are false and misleading are set forth with particularity above.

92.     Defendants knew or recklessly disregarded the false and misleading nature of their representations and omissions. The bases for defendants' knowledge or reckless disregard are set forth with particularity above.

93.     Defendants made the materially misleading statements and omissions for the purpose of inducing Plaintiffs to buy and retain the Certificates.

94.     Plaintiffs justifiably relied on defendants' materially misleading statements and omissions, as they went to the core of their investment decision on the Certificates: the risk attending such notes and determination of whether the interest adequately compensated investors. The Certificates would not have issued and would have been unmarketable but for defendants' misleading statements and omissions.

95.     Defendants' misrepresentations and omissions went to the credit quality of the Certificates and the underlying collateral assets. When the truth regarding these assets was revealed, the value of the Certificates collapsed. Later, when the FCIC findings as to Clayton began to be disclosed, Union Central had reason to learn it had been defrauded.

96.     Defendants continued throughout the relevant time period to conceal information about the credit quality of the Certificates and the collateral assets acquired by Union Central.

97.     Defendants undertook to sell hundreds of millions of dollars in Certificates to investors. Having elected to make representations to investors in order to sell Certificates to them, defendants owed such investors a duty to disclose all material information, including adverse information.

98.     Defendants were in a superior position to certificate investors as a consequence of their selling and trading of assets, such as collateral assets. Knowing that investors entrusted hundreds of millions of dollars to defendants and knowing that such investors were sold Certificates

that were represented to be secure and stable investments, defendants had a duty to report to certificate investors that their investment capital and income was at risk of increasingly deteriorating credit conditions.

99.     Union Central has been injured as its Certificates are worthless or severely impaired.

## COUNT II

### Claim for Negligent Misrepresentation
### Against All Defendants

100.     Union Central repeats and realleges the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

101.     This is a claim for negligent misrepresentation against all defendants.

102.     Defendants' materially inaccurate written representations and omissions were in substantially identical written materials distributed to Union Central.

103.     The Registration Statements and other documents distributed by defendants told investors to rely upon them. Defendants expected investors to rely upon them.

104.     The Registration Statements and other documents contained materially false and misleading statements and omissions as alleged above.

105.     Plaintiffs did rely upon these documents.

106.     It was the Plaintiffs' reasonable expectation – as is common industry practice and sound business practice – that defendants would update the prospectuses to reflect material changes in the quality of the mortgages included in the trusts. Plaintiffs relied on the lack of changes to the documents as to the quality of the mortgages in making decisions to purchase and/or retain the Certificates.

107.     Defendants had a special duty of care to accurately and completely represent all material facts to the investors because:

- 29 -

(a)    they owed such investors a fiduciary duty as alleged above; and

(b)    they made an undertaking in the Registration Statements to provide updates to reflect significant changes in the credit quality of the MBS portfolio.

108.    Defendants were responsible for distributing information to Plaintiffs. Defendants therefore knew or should have known that investors would act or refrain from taking action on the basis of information they provided.

109.    Plaintiffs took action and refrained from taking action on the basis of defendants' negligent statements and omission, as:

(a)    if defendants had accurately reported in the Registration Statements the defects in the mortgages and the actual risk assumed by Union Central, Union Central would not have purchased the Certificates; and

(b)    if defendants had properly updated the Registration Statements consistent with their duties and undertakings, Union Central would have protected its investment capital by (i) insuring against the increased risk; or (ii) selling its MBS to less risk-averse investors, such as distressed asset investors.

110.    Plaintiffs have suffered damages as a result of defendants' negligent misrepresentation.

## COUNT III

### Claim for Unjust Enrichment
### Against CSFB

111.    Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

112.    This is a claim for unjust enrichment against CSFB.

113. CSFB received substantial compensation for selling the Certificates to investors. On information and belief, these fees were derived from the volume of Certificates sold to Union Central and other investors. Thus, the more Certificates sold from the Trusts, the larger CSFB's fees. This economic incentive to sell Certificates, even in an increasingly risky market, explains but does not justify CSFB's failure to accurately report information about the collateral.

114. CSFB directly contributed to the destruction of millions of dollars in investment value as a result of its structuring, rating and doing business with the Trusts. CSFB stood in conflicted positions relative to the Certificates. CSFB failed to exercise reasonable care in conducting its specific oversight roles with respect to the MBS, but was paid substantial profits and fees from the securitizations.

115. New York has a public policy interest in fostering the integrity and transparency of financial markets since it is one of the leading financial centers in the world. CSFB's ill-gotten gains should be disgorged in favor of Plaintiffs in order to protect and promote this public policy.

## COUNT IV

### Claim for Aiding and Abetting
### Against All Defendants

116. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs, inclusive, as if fully set forth herein.

117. This is a claim against defendants for aiding and abetting the other defendants' violations of law alleged herein.

118. This claim is alleged in the alternative to each Count against defendants to the extent such claim does not proceed.

119. Defendants knew of each of the other defendants' violations of laws and substantially assisted in such violations.

- 31 -

120.    Plaintiffs were damaged thereby.

## COUNT V

### For Violation of §10(b) and Rule 10b-5 as to
### Series 2006-8, Series 2007-1 and Series 2007-3 Against
### Defendants CSFB, CSFB Underwriter, Kimura, Altabef and Zingalli

121.    Union Central repeats and realleges the allegations above as they relate to Series 2006-8, Series 2007-1 and Series 2007-3, as if fully set forth herein.

122.    This claim is brought under §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against defendants CSFB, CSFB Underwriter, Kimura, Altabef and Zingalli (collectively the "§10(b) Defendants"). The §10(b) Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Union Central, in violation of §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

123.    The §10(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the securitizations from Union Central, as reflected in the misrepresentations and omissions set forth above.

124.    The §10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

125. As a result of the §10(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Union Central was misled into believing that the Certificates were more creditworthy investments than they actually were.

126. Union Central purchased the Certificates without knowing that the §10(b) Defendants had misstated or omitted material facts about the securitizations. In purchasing the Certificates, Union Central relied directly or indirectly on false and misleading statements made by the §10(b) Defendants, and/or an absence of material adverse information that was known to the §10(b) Defendants or recklessly disregarded by them but not disclosed in CSFB's public statements or its communications with Union Central. Union Central was damaged as a result of its reliance on the §10(b) Defendants' false statements and misrepresentations and omissions of material facts.

127. At the time of the §10(b) Defendants' false statements, misrepresentations and omissions, Union Central was ignorant of their falsity and believed them to be true. Union Central would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

128. Union Central is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Union Central's claim, and within five years after the violations with respect to Union Central's investments in Series 2006-8, Series 2007-1 and Series 2007-3.

129. By virtue of the foregoing, the §10(b) Defendants have violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

130. As a direct and proximate result of §10(b) Defendants' wrongful conduct, Union Central has suffered damages in connection with the purchase and subsequent decline in value or default of the Certificates.

## COUNT VI

### For Violation of §20(a) of the 1934 Act as to
### Series 2006-8, Series 2007-1 and Series 2007-3 Against
### Defendants CSFB, Kimura, Altabef, Echevarria and Marriott

131.    Union Central repeats and realleges the allegations above as if fully set forth herein.

132.    Each of the §10(b) Defendants is liable as a direct participant and primary violator with respect to the wrongdoing discussed herein. CSFB and Kimura, Altabef, Echevarria and Marriott (the "§20(a) Defendants"), by reason of their status as parent company and senior executive officers and directors of CSFB, directly or indirectly controlled the conduct of CSFB's business and its representations to Union Central, within the meaning of §20(a) of the 1934 Act. The §20(a) Defendants directly or indirectly controlled the content of the Registration Statements and Prospectus Supplements for Series 2006-8, Series 2007-1 and Series 2007-3 related to Union Central's investments in the Certificates within the meaning of §20(a) of the 1934 Act. Therefore, the §20(a) Defendants are jointly and severally liable for CSFB's fraud, as alleged herein.

133.    The §20(a) Defendants controlled and had the authority to control the content of certain of CSFB's documents, including the Series 2006-8, Series 2007-1 and Series 2007-3 offering documents. Because of their involvement in the everyday activities of CSFB, and because of their wide-ranging supervisory authority, the §20(a) Defendants reviewed or had the opportunity to review those documents prior to their issuance and therefore knew or should have known that those documents contained misrepresentations. The §20(a) Defendants reviewed or could have reviewed these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

134.    The §20(a) Defendants knew or recklessly disregarded the fact that CSFB's representations were materially false and misleading and/or omitted material facts when made. In so doing, the §20(a) Defendants did not act in good faith.

135. By virtue of their high-level positions and their participation in and awareness of CSFB's operations and public statements, the §20(a) Defendants were able to and did influence and control CSFB's decision-making, including controlling the content and dissemination of the documents that Union Central contend contained materially false and misleading information and on which Union Central relied.

136. The §20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violation alleged herein, as set forth more fully above.

137. As set forth above, the §10(b) Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the §20(a) Defendants are also liable pursuant to §20(a) of the 1934 Act.

138. As a direct and proximate result of defendants' wrongful conduct, including the wrongful conduct of the §20(a) Defendants, Union Central suffered damages in connection with its purchases of Certificates from CSFB.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Awarding compensatory damages in favor of Plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

C. Awarding statutory damages; and

D. Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: April ____, 2011

> ROBBINS GELLER RUDMAN
> &amp; DOWD LLP
> SAMUEL H. RUDMAN
> DAVID A. ROSENFELD
>
> _____
> SAMUEL H. RUDMAN
>
> 58 South Service Road, Suite 200
> Melville, NY 11747
> Telephone: 631/367-7100
> 631/367-1173 (fax)
>
> ROBBINS GELLER RUDMAN
> &amp; DOWD LLP
> DARREN J. ROBBINS
> DAVID C. WALTON
> ARTHUR C. LEAHY
> THOMAS E. EGLER
> SCOTT H. SAHAM
> JOHN J. STOIA, JR.
> 655 West Broadway, Suite 1900
> San Diego, CA 92101
> Telephone: 619/231-1058
> 619/231-7423 (fax)
>
> Attorneys for Plaintiffs

- 36 -

# EXHIBIT 1

### UNIFI's CSFB Certificates

| Certificate | Original Face Amount | Issuing Entity | Issue Date | Purchase Date |
|---|---|---|---|---|
| CSMC 07-1 CB1 | $10,205,000 | CSMC MORTGAGE-BACKED TRUST 2007-1 | 1/1/2007 | 3/16/2007 |
| CSMC 2007-3 4A11 | $2,540,000 | CSMC MORTGAGE-BACKED TRUST 2007-1 | 3/1/2007 | 1/18/2008 |
| CSMC 07-3 CB1 | $9,307,000 | CSMC MORTGAGE-BACKED TRUST 2007-3 | 3/1/2007 | 08/13/2007 |
| CSMC 07-3 CB2 | $2,246,000 | CSMC MORTGAGE-BACKED TRUST 2007-3 | 3/1/2007 | 8/13/2007 |
| CSFB 05-FIX1 M4 | $3,000,000 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-1 | 1/1/2005 | 2/2/2005 |
| CSFB 2005-FIX1 M5 | $3,187,500 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-1 | 1/1/2005 | 2/2/2005 |
| CSFB 2005-FIX1 M6 | $1,875,000 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-1 | 1/1/2005 | 2/2/2005 |
| CSFB 05-1 CB3 | $1,583,461 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-1 | 1/1/2005 | 2/15/2005 |
| CSFB 05-7 CB1 | $3,618,645 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-7 | 7/1/2005 | 8/30/2005 |
| CSFB 05-7 CB2 | $603,107 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-7 | 7/1/2005 | 8/30/2005 |
| CSFB 05-6 CB1 | $1,844,865 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-6 | 6/1/2005 | 8/19/2005 |
| CSFB 05-10 CB1 | $3,893,099 | CSFB MORTGAGE-BACKED TRUST SERIES 2005-10 | 10/1/2005 | 12/14/2005 |
| CSMC 2006-8 CB1 | $6,699,000 | CSMC MORTGAGE-BACKED TRUST 2006-8 | 9/1/2006 | 10/17/2006 |
| CSMC 2006-8 CB2 | $2,790,000 | CSMC MORTGAGE-BACKED TRUST 2006-8 | 9/1/2006 | 10/17/2006 |
| CSMC 2006-8 CB3 | $1,953,000 | CSMC MORTGAGE-BACKED TRUST 2006-8 | 9/1/2006 | 10/17/2006 |